# Exhibit A

# MINNPOST

# Who's minding the store? Billions in Minnesota contracts escape competitive bids, auditing

By Sen. John Marty | 12/20/10

Over the years, many items in the state budget have been scrutinized with a fine-tooth comb. Even relatively small expenditures and contracts are reviewed to see if there is a way to save money or perform the task more efficiently.

Sometimes, however, there are big-ticket items that get nowhere near the scrutiny they deserve.



Sen. John Marty

I receive looks of disbelief when I tell people at the Capitol that there is one area of the budget where huge contracts – totaling *over $3 billion per year* – are made, without competitive bidding or auditing, and with minimal reporting.

Unlike all other parts of the budget, these contract holders are not required to use the standard "GAAP" (Generally Accepted Accounting Principles) that businesses, accounting firms and other government agencies use. And the system is rigged in a manner that whatever the contractors spend, the state will pay the bills.



Turning 65 soon?
Find out about great Medicare options at ucareplans.org

Care

Health care that starts with you.

Where is this shameful lack of oversight? It is in our public health programs, including Medicaid and MinnesotaCare. These are important programs, providing health care for hundreds of thousands of people, yet nobody is watching the store. We know how much the state pays health plans to provide care, but have no way of knowing how much money is going to the people who need care and how much is eaten up by insurance company overhead. The state blindly accepts whatever numbers the HMOs provide.

Now with a $6 billion deficit, we can no longer stick our heads in the sand.

This is not meant to vilify health plans. There are good people working for them, and they help people access medical care. But that doesn't mean that we should leave the cash register open, and blindly let them take as much money as they want.

## Began as a pilot project

This situation occurred as the state privatized delivery of health care for low-income and disabled people over the last 20 years. It started as a pilot project on the theory that private insurance companies could deliver health care at a lower cost. Instead of paying medical bills directly, Minnesota would contract with Health Maintenance Organizations (HMOs) to provide care for low-income people.

The pilot project was to be evaluated by the Department of Human Services (DHS), but that was never really done. In 1993, the department conducted a study to find if HMOs were saving money, but the study was hampered by a lack of data from the HMOs. Even so, the study raised questions about whether the state was getting its money's worth. Rather than demand more data from the insurance companies, the agency buried the study. A front-page newspaper story at the time was titled, "Study Shelved After HMOs Complained." The story reported that DHS "reassigned the researcher and abolished his job."

Instead of trying to learn whether the HMOs were spending money appropriately, the state brushed aside concerns and continued turning more public business over to them.

Despite two Legislative Auditor reports calling for greater scrutiny, DHS has not conducted any audits.

## HMOs define admin costs, health-care costs

In these contracts, Minnesota allows the HMOs to define what they count as administrative costs and what they count as health care, enabling them to hide spending on administrative overhead. Even more surprising, the state covers all those costs, no matter how great they are. The director of these contracts at DHS said the administration believes the state *must* cover all of the costs, including the administrative costs, so that the HMOs will be "actuarially sound."

During the 2010 session we offered legislation that would require the HMOs to meet a medical "loss ratio," refunding money to the state if they spent too much on administrative overhead. But under the current irresponsible method of contracting with the health plans, the administration claims that if the HMOs broke the law and were required to pay a penalty, the taxpayers would have to reimburse even the costs of those fines!

As the state was cutting services to people who are sick and disabled, the HMOs made – even after unlimited administrative expenses – over $130 million in profit just from these public contracts in 2009 (technically they are "earnings," not profits, because the HMOs are non-profit). It's time that we show more interest in the financial soundness of the state budget than in higher profits for the insurance companies.

The 2010 legislation contained a provision that would require HMOs to use standard accounting practices like every other government contract requires, and be subject to audits. A Pawlenty administration official said that requiring the insurance companies to account for their spending this way would cost more, which the state would have to pay for. In other words, the administration suggests that taking off the blindfold and finding out whether we are being shortchanged, might cost us more money. That's absurd.

Unfortunately, pressure from the HMOs succeeded in blocking this legislation, so there is still no oversight of this $3 billion in public contracts.

**Seeking greater transparency, accountability**
David Feinwachs, an attorney for the Minnesota Hospital Association, is spearheading the effort to bring greater transparency and accountability to these programs because of his concern over the waste of taxpayer money. Although savings from this reform would benefit the hospitals, Feinwachs was recently fired after 30 years at the association, apparently because the HMOs put pressure on the Hospital Association to silence him.

This scandal is finally being exposed, with a TV investigative report and other media coverage. Even in good financial times, waste of public money is unacceptable. In times of financial crisis it is inexcusable.

Fortunately, there will be a new administration in just a few weeks. The Dayton administration has a great opportunity to open the books and provide some financial accountability here.

*Sen. John Marty represents District 54 in the Minnesota Senate. This article originally appeared in To the Point!, which is published by the Apple Pie Alliance.*

**COMMENTS (4)**

SUBMITTED BY MYLES SPICER ON DECEMBER 20, 2010 - 9:26AM.

# Exhibit B

# Senator
# John Marty

May 18, 2011


Cynthia Mann
Director of the Center for Medicaid and State Operations
Department of Health and Human Services
Centers for Medicare & Medicaid Services
7500 Security Blvd
Mail Stop S2-01-16
Baltimore, Maryland 21244-1850

Dear Ms. Mann:

I am writing to encourage CMS not to extend Minnesota's 1115 Waiver of the Medicaid Program.

It may seem unusual for a state senator to argue against continuation of a federal waiver that the state has been operating under for so long. However, the lack of accountability and the poor oversight of this "demonstration project" have resulted in less access to health care for many low income Minnesotans. It has also wasted millions in state and federal Medicaid funds.

The scope of the mismanagement is huge. The problem is so severe and has been going on for so long, that it is not clear that the problem can be fixed. To avoid wasting future Medicaid funds, I ask you end the waiver program in Minnesota and have the state contract directly with hospitals, clinics, doctors, and other providers to deliver health care to low income people.

Despite the fact that the Medicaid population is low income and higher risk than the commercial insurance population, the HMOs have been making over four times as much in profits (technically "earnings," since Minnesota law requires them to be non-profit) on the state business than they are on their commercial business in recent years.

Some evidence of the extent to which these funds have been mismanaged:

**Minnesota's Medicaid managed care programs and contracts have never been fully audited,** despite being two decades old. In 1993, the Department of Human Services (DHS) conducted a study to find out whether the HMOs were saving the state money compared to the direct contracting model, but the study was hampered by a lack of data from the HMOs. Even so, the study raised many questions about whether the state was getting its money's worth, citing concerns that program participants were not receiving appropriate levels of preventive services such as cancer testing. Rather than demand more data from the insurance companies receiving the state money, DHS buried the study. A front-page newspaper exposé of the study was subtitled, "Study Shelved After HMOs Complained." The story reported that DHS "reassigned



*Recycled Paper*
*30% Post-*
*Consumer Fiber*

the researcher…and abolished his job—leaving the agency without the ability to study the HMOs any further."    *Star Tribune, "A study that raised concerns about how well HMOs serve the poor feel on deaf ears at the Human Services Department. Study shelved after HMOs complained." (March 13, 1994).*

**Minnesota's rate-setting process is a mystery, at best.** Late last year, my office requested an explanation from DHS about how our rate setting process works. We received an unsigned, convoluted memo that left us wondering whether DHS knew what they were doing. The DHS official responsible for Medicaid rate setting has testified that DHS relies on the HMOs to provide the data used to develop the rates, and does not audit that data. DHS doesn't even ask further questions unless they see obvious discrepancies. In a February hearing, the DHS official's defense of DHS' lack of oversight was weak: "…it is not ***completely*** taken on blind faith." (emphasis added.) The encounter and claims data that would be necessary for DHS to negotiate rates, or at least make sure that they are reasonable, are not available because the HMOs claim that it is "proprietary data." In effect, DHS has no way of knowing whether the rates it is "certifying" to CMS are reasonable or not.

Also, under the Medicaid program, the HMOs have no Medical Loss Ratio to meet. Even if they did have such a requirement, the state allows them to set their own definitions of medical and administrative expense. Many state officials assume that the HMOs are operating efficiently, based simply on the HMOs *self-reported* low administrative costs, which the HMOs base on their own definition of administrative costs. Back in 2001, Minnesota's attorney general exposed that one HMO was classifying tickets to Timberwolves basketball games and golf packages for their executives as medical expenses. The attorney general reported great frustration in his inability to get the data necessary to conduct proper oversight. We also have no way of knowing if the HMOs are comingling funds between their Medicaid contracts and their commercial business.

Perhaps the clearest evidence that these Medicaid HMO contracts are out of control is that one of the smaller HMOs recently made one of the largest charitable contributions in state history – a $30 million donation, not to some charitable foundation, but to the state general fund, because they recognized that they have been making too much money off of the Medicaid contract, especially when the state's budget problems are leading to deep cuts in health care programs for the poor and disabled.

**Regardless of how the rates are set, Minnesota uses state and federal Medicaid funds to pay all costs incurred by HMOs, even fines and penalties.** The DHS official in charge of Medicaid rate setting has testified that the state believes that it must cover ***all*** expenses the health plans claim, no matter how unreasonable, so that the HMOs are "actuarially sound". In fact, the DHS fiscal analysis of legislation that would have required the HMOs to meet a medical loss ratio, said that if a health plan does not meet the loss ratio and pays a penalty, "the cost of paying the penalty will be included in the health plan's experience in subsequent years and may result in higher DHS capitation rates." In other words, because Minnesota payments to HMOs under the 1115 Waiver are based on their previous year's expenditures, we get the absurd result that DHS uses state and federal Medicaid dollars to pay all expenses the HMOs incur, even fines and penalties for breaking the law!

**Minnesotans are not getting the services for which they have paid.** The HMOs are paid to manage care for program recipients, but we are not getting our money's worth. Last year when Minnesota replaced a state-funded health care program where care had been "managed" by the HMOs, with direct contracts with four large hospitals, Hennepin County Medical Center

(HCMC) found that of the 8000 enrollees that it was taking, a couple hundred had been hospitalized *three or more times in the previous year.* HCMC recognized that these individuals were not getting basic care, so they established a small primary care clinic, which resulted in significant savings by preventing the need for hospitalization. For years, the state paid the HMOs to manage their care, yet they did such a poor job that a hospital was able to step in and do a far better job in just months.

*Note: The HMOs and the state agencies will undoubtedly point to the numerous reports that are filed by the HMOs, "boxes of data," to dismiss concerns over the lack of accountability. Yes, the HMOs provide numerous reports and information to the state. And, there are many hardworking people in the agencies, collecting that data and attempting to provide oversight. Likewise there are many good people working at the HMOs. **But, lots of data and numerous reports do not equal effective oversight.** Unfortunately, the encounter and claims data needed to effectively negotiate rates and hold the HMOs accountable are being treated as "trade secrets" by the HMOs. Despite numerous reports and paperwork, nobody is minding the store, providing real oversight over costs and care. That is evident when the DHS official in charge of managed care contracts believes Medicaid needs to pay even for fines and penalties incurred by the HMOs.*

The issue of good stewardship of Medicaid dollars is even more pressing now that Minnesota has greatly expanded its Medicaid enrollment, through the early enrollment option under PPACA. I am proud that Governor Dayton's first major action was to opt into this life-saving initiative. This expansion of coverage will make a tremendous difference in the lives of many low income people, but it also means these HMO contracts are growing even bigger.

Although the governor has expressed strong interest in improving accountability, the mismanagement has been so bad for so long, that it could take years to straighten out that mess. If we have not had a true audit of the contracts even once in twenty years, it will take a lot of time to audit, let alone fix the problem. With literally billions of state and federal dollars at stake, we cannot afford to continue pouring more money into this dysfunctional program. Nor can the state count on savings from competitive bidding or other reforms when we don't have access to real-time, verified and comprehensive data.

According to CMS, the purpose of the 1115 Waiver is "to authorize experimental, pilot, or demonstration projects likely to assist in promoting the objectives of the Medicaid statute." Minnesota has been operating a "demonstration" program with managed care organizations under a waiver since the 1980s, yet the state has never completed a study to determine whether the HMO contracts were better than having the state contract directly with providers.

The real issue here is fiscal responsibility. Although the HMOs have been claiming for years that Fee-For-Service (FFS) is more expensive when the state contracts directly with providers than when the HMOs pay providers (also through FFS), in the two decades that Minnesota has operated this "demonstration" project, the state has never done a true cost comparison. While the per capita cost of DHS's fee-for-service enrollees is higher than those in the HMOs, this is due to the fact that the higher-need patients (elderly, people with disabilities) are DHS enrollees, not in the HMO contracts.   The only available evidence directly comparing the two options (from GAO, comparing traditional Medicare with Medicare Advantage) is that direct administration is cheaper, not more expensive than privatizing the programs:

"Although private health plans were originally envisioned in the 1980s as a potential source of Medicare savings, such plans have generally increased program spending.  In 2006, Medicare paid $59 billion to Medicare Advantage (MA) plans—an estimated $7.1 billion more than Medicare would have spent if MA beneficiaries had received care in Medicare fee-for-service (FFS)."  *Feb. 28, 2008 GAO Report*

With the gross mismanagement of Minnesota's Medicaid contracts illustrated earlier in this letter, on top of the evidence that managed care is more expensive than direct contracting, the huge amount of wasted funding merits the prompt termination of the "demonstration project."

Even if the 1115 waiver program would, somehow, instantly become properly managed in Minnesota, the evidence is that it would cost more than direct contracting of the Medicaid program.

**Consequently, I strongly urge CMS not to extend Minnesota's 1115 Waiver of the Medicaid Program.  Minnesota can save money by providing care to Medicaid enrollees directly, managing the care through the "Primary Care Case Management" option, which does not require any CMS waiver.**

Should CMS choose to extend the waiver, I ask you to require Minnesota to meet strict accountability standards, similar to what CMS required in Florida.  Those requirements must include a comprehensive audit done by an independent organization that has not had any contracts or financial ties to the State of Minnesota or any health plan or health provider in recent years, as well as immediate implementation of an electronic information clearinghouse for encounter and claims data.  Additionally, CMS should direct the state to stop letting the HMOs hide behind "proprietary data" and require the state to certify Medicaid rates directly rather than rubberstamping the data that the HMOs provide.

It is time to ensure that state and federal Medicaid funds are wisely spent to provide health care to low income Minnesotans.  Again, I urge you not to extend Minnesota's 1115 waiver.  Short of that, please require true accountability.

I would be pleased to discuss this further, if you have any questions, or if I can be of any assistance.

Sincerely,

Senator John Marty

# Exhibit C

Senator
John Marty

# Senate

### State of Minnesota

September 6, 2011

Richard Jensen
CMS

Dear Mr. Jensen:

I'm sorry that I was out of town and unable to participate in the August 2 conference call between your office and a number of Minnesotans regarding concerns about Minnesota's Prepaid Medical Assistance Program and renewal of the state's 1115 waiver.

Your willingness to continue hearing our concerns and addressing them is greatly appreciated. I share the concerns raised by those participating in the phone call and appreciate the follow up letter that they sent to you last week.

However, I have some more fundamental questions that I believe need addressing by CMS.

In my May 18th letter to Cynthia Mann (and the follow-up email to you that provided documentation for statements made in the letter), I urged CMS not to renew the waiver because the scope of the mismanagement of the PMAP program in Minnesota was so great, and the mismanagement has been occurring for so long, that it is unclear that the problem can be fixed.

I appreciate CMS' interest in getting better data and more transparency, but believe the problem is much more serious than that. The lack of accountability and the poor oversight of this "demonstration project" have resulted in less access to health care for many low income Minnesotans, and has wasted millions and millions of dollars in state and federal Medicaid funds.

Cynthia Mann acknowledged receipt of my earlier correspondence, but never responded to any of the specifics in the letter. Although the 1115 Waiver has been renewed, I would appreciate response to the following questions:

Do you think that I am wrong about Minnesota's Medicaid funds being mismanaged, or that I overstated the scope of that mismanagement? If so, which statements in my letter were inaccurate or overstated?

If my statements were accurate, I simply do not believe that the additional reporting in the waiver renewal is sufficient to ensure that this money will now be wisely spent.

Thank you for your attention to this request.

Sincerely,

John Marty

cc:   Cynthia Mann

attachment:   May 18th letter to CMS

# Exhibit D

Matt Ehling
Public Record Media, LLC
2375 University Ave. W.
Ste 200
Saint Paul, MN 55114


February 22, 2012


Centers for Medicaid and Medicare Services
Attn:  Freedom of Information Officer
North Building, Room N2-20-06
7500 Security Boulevard
Baltimore, Maryland 21244


RE:  Freedom of Information Act Request


Dear FOIA officer,

This is a request under the Freedom of Information Act (5 U.S.C. § 552).  I request that copies of the following records be provided to me:

> Any and all memoranda, correspondence, or communications - in paper or electronic form – between employees or officials of CMS, and Minnesota State Senator John Marty;

> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS related to Minnesota State Senator John Marty;

> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS, produced between January 1, 2011, and February 1, 2012, related to determinations made by your agency about Minnesota's 1115 Medicaid waiver status.

In order to help you determine my status for the purpose of assessing fees, you should know that this request is made as part of news gathering, and is not for commercial use. Responsive files will be shared with researchers, journalists, and the public, and will not be licensed for profit.

I am seeking a waiver of fees for this request, since the public dissemination of the requested materials will aide the public's understanding of the federal government's role as it relates to Minnesota's public health care programs.

If my fee waiver is denied, I am willing to pay fees of up to $100.00 without prior notice. If fees are estimated to exceed this amount, please notify me first.

If this request is denied in whole or in part, please notify me of the legal basis for the denial, as well as all appeals procedures available under law.

I can be contacted at 651-335-2037 or info@publicrecordmedia.com if you need to discuss any aspect of this request.

Sincerely,

Matt Ehling
President, Public Record Media

# Exhibit E

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



**Office of Strategic Operations and Regulatory Affairs/Openness, Transparency & Accountability Group**
Refer to: Control Number **030720127082** and PIN **W767**

**3/8/2012**

**Matt Ehling**
**Public Record Media, LLC**
**2375 University Ave. W, Suite 200**
**Saint Paul, MN 55114**

Dear Mr. Ehling:

This acknowledges receipt of your Freedom of Information Act (FOIA) request
dated 2/22/2012 submitted to the Centers for Medicare & Medicaid Services
(CMS) or one of this agency's Medicare contractors via letter, facsimile
transmission or e-mail, or in the form of a subpoena duces tecum or Provider
Reimbursement Review Board discovery request to CMS.

If you are seeking personalized information pertaining to your Medicare benefits and services,
including claim information (excluding Part D claims) you may access this information online
through the following CMS website: www.MyMedicare.gov.

We have initiated a search to locate records falling within the scope of your request.  If our
searching units advise us that you have requested a voluminous amount of records that require
extensive search and examination, my staff will contact you shortly to discuss your willingness
to modify your request.

The FOIA requires that we respond to your request within 20 working days of its receipt in this
office. Please note the following unusual and exceptional circumstances that will impact our
response time:  (1) we will need to search for and collect records from components and/or field
offices external to this office; and (2) because we receive a very heavy volume of FOIA requests,
we will process your request in line with our established policy of "first in, first out" case
processing.  This policy is consistent with court decisions regarding FOIA's time limits.  To
check the status of your request please refer to the CMS FOIA website
at http://www.cms.gov/apps/FOIA. The status of your request is displayed after you have entered
the control number and PIN number in the appropriate fields.

The law authorizes us to collect fees for responding to FOIA requests and assume that you are
willing to pay any applicable fees for processing this request.  If at any time the fee for

processing your request is estimated to exceed $250.00, we will send you an invoice for the estimated fee and suspend further processing until payment of the invoiced amount is received. If the estimated processing fee does not exceed $250.00, we will send you an invoice for the actual fee with our response.

Please note the following:

If you believe that we should expedite the processing of your request because the requested records are needed in light of a compelling need; i.e., an imminent threat to the life and safety of an individual; an urgency to inform the public concerning government activity (provided you are a member of the media); a deadline in litigation; a deadline for commenting on proposed regulations; or other urgent matters, you must ask for expedited processing in writing and provide to this office as much relevant information as possible.  In line with 5 U.S.C. § 552(a)(6)(E)(vi), you must demonstrate the compelling need in a statement certified to be true and correct to the best of your knowledge and belief.   Attach any supporting documentation to your statement, including a court scheduling order if your request is based upon a litigation deadline. (Fax supporting documentation to the Freedom of Information Group at (410) 786-0474).

If your request seeks a waiver or reduction of the fees that we would customarily charge for furnishing agency records and your request does not contain sufficient information to enable us to determine whether a waiver or reduction of fees is warranted, you should provide such information to this office within 10 working days of receipt of this letter.  In line with 45 C.F.R. § 5.45, such information must include a detailed explanation of how disclosure to you:  (1) is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government, and (2) is not primarily in the commercial interest of the requester.  I especially need to know how you intend to disseminate the information to the public.

When submitting this additional information, please refer to the case number listed at the top left-hand corner of this letter, and send it to: The Freedom of Information Group, Room N2-20-16, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

Any questions regarding the status of this request should be directed to **Vendetta Dutton** at **410-786-0519**.

Sincerely yours,

Michael S. Marquis
Director
Division of Freedom of Information

# Exhibit F

Matt Ehling
Public Record Media, LLC
2375 University Ave. W.
Ste 200
Saint Paul, MN 55114



April 23, 2012


Centers for Medicaid and Medicare Services
Attn:  Principal Deputy Administrator
Room C5-16-03
7500 Security Boulevard
Baltimore, Maryland 21244


RE:  Administrative appeal - FOIA request control number 030720127082, PIN W767


Dear Deputy Principal Administrator,

On February 22 of 2012, I submitted a Freedom of Information Act (5 U.S.C. § 552) request to your office.  The request was sent via certified mail, and it sought the following information:

> "Any and all memoranda, correspondence, or communications - in paper or electronic form – between employees or officials of CMS, and Minnesota State Senator John Marty;
>
> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS related to Minnesota State Senator John Marty;
>
> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS, produced between January 1, 2011, and February 1, 2012, related to determinations made by your agency about Minnesota's 1115 Medicaid waiver status."

The request was submitted as a part of news gathering.  In it, I requested a waiver of fees, since disclosure of the requested information would contribute significantly to the public's understanding of the federal government's role relative to Minnesota's public health care programs.  In addition, I set a limit on the amount of fees that I would be willing to pay without prior notice, if my waiver was denied.

For reference, a copy of the original request is attached to this correspondence.

**Response letter of March 8, 2012**
On March 8th, your agency responded to my initial request, and assigned it control number 030720127082, PIN number W767.  In the letter, Michael Marquis, Director of the Division of Freedom of Information, noted that my request had been received, and detailed your agency's procedures for making requests for expedited processing, as well as for providing additional information related to requests for the waiver of fees.

For reference, a copy of that letter is attached to this correspondence.

**Expiration of twenty-day statutory response time**
As you are aware, 5 U.S.C. § 552(6)(A)(i) requires federal agencies to make a determination about the release of information requested via the FOIA within twenty business days, and also to notify the requester of that determination.

Over twenty business days have elapsed since I received your agency's letter of March 8, 2012.

**Notice of unusual circumstances impacting response time**
In his letter of March 8, Director Michael Marquis noted that certain "unusual and exceptional circumstances" would impact your agency's response time, including the need to collect material from field offices, as well as your agency's heavy volume of FOIA requests.

5 U.S.C. § 552(6)(B)(i) allows for an up to ten-day extension of the normal twenty-day response time due to "unusual circumstances" as described in 5 U.S.C. § 552(6)(B)(iii). Such an extension requires the agency to provide written notification of the extension.

Director Marquis' written notice of the "unusual and exceptional circumstances" that would impact your agency's response time could be interpreted as an implicit notification of the ten-day maximum extension to the statutory FOIA response time, since such an extension is the only one available under 5 U.S.C. § 552.

**Expiration of ten-day extension period**
As of the date of this writing, the ten-day maximum extension period that began after the expiration of the twenty-day statutory response time has elapsed.

**Administrative review sought**
I am seeking administrative review of your agency's failure to respond to my FOIA request of February 22, 2012.  My right to administrative review is established by the FOIA, and by your agency's appeals procedures as set out in the CMS Freedom of Information Act (FOIA) Policy and Procedural Instructions (the "Instructions"). According to section 30.11 of the Instructions, a requestor can file an administrative appeal based upon "constructive denial" of a request.  "Constructive denial" is defined as "when the agency has not responded to a FOIA request within statutory timelines."

**Constructive denial is basis for administrative review**

As of the date of this writing, your agency has not provided a determination related to my request during either the twenty-day statutory response period, or during the ten-day extension period that followed it.  As such, your agency has engaged in constructive denial of my request, as defined by the Instructions.  This action by your agency forms the basis for my administrative appeal.

**Time frame for administrative appeal**

As noted in section 30.11 of the Instructions, a requestor may file an administrative appeal within 30 calendar days of the date of the agency's decision letter.  At the time of this writing, your agency has provided me with no such decision letter.

I have filed this administrative appeal two days after the expiration of all applicable statutory time frames.

**Result sought**

Through the administrative appeal process, I am seeking to receive copies of all documents responsive to the categories outlined in my original FOIA request of February 22, 2012.

**Additional information**

I can be contacted with any questions related to this request at 651-335-2037, or at info@publicrecordmedia.com.

Sincerely,

Matt Ehling
President, Public Record Media, LLC

------- **COPIES ENCLOSED** -------

Matt Ehling
Public Record Media, LLC
2375 University Ave. W.
Ste 200
Saint Paul, MN 55114


February 22, 2012


Centers for Medicaid and Medicare Services
Attn:  Freedom of Information Officer
North Building, Room N2-20-06
7500 Security Boulevard
Baltimore, Maryland 21244


RE:  Freedom of Information Act Request


Dear FOIA officer,

This is a request under the Freedom of Information Act (5 U.S.C. § 552).  I request that copies of the following records be provided to me:

> Any and all memoranda, correspondence, or communications - in paper or electronic form – between employees or officials of CMS, and Minnesota State Senator John Marty;

> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS related to Minnesota State Senator John Marty;

> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS, produced between January 1, 2011, and February 1, 2012, related to determinations made by your agency about Minnesota's 1115 Medicaid waiver status.

In order to help you determine my status for the purpose of assessing fees, you should know that this request is made as part of news gathering, and is not for commercial use. Responsive files will be shared with researchers, journalists, and the public, and will not be licensed for profit.

I am seeking a waiver of fees for this request, since the public dissemination of the requested materials will aide the public's understanding of the federal government's role as it relates to Minnesota's public health care programs.

If my fee waiver is denied, I am willing to pay fees of up to $100.00 without prior notice. If fees are estimated to exceed this amount, please notify me first.

If this request is denied in whole or in part, please notify me of the legal basis for the denial, as well as all appeals procedures available under law.

I can be contacted at 651-335-2037 or info@publicrecordmedia.com if you need to discuss any aspect of this request.

Sincerely,

Matt Ehling
President, Public Record Media

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



Office of Strategic Operations and Regulatory Affairs/Openness, Transparency & Accountability Group
Refer to: Control Number **030720127082** and PIN **W767**

**3/8/2012**

**Matt Ehling**
**Public Record Media, LLC**
**2375 University Ave. W, Suite 200**
**Saint Paul, MN 55114**

Dear Mr. Ehling:

This acknowledges receipt of your Freedom of Information Act (FOIA) request
dated 2/22/2012 submitted to the Centers for Medicare & Medicaid Services
(CMS) or one of this agency's Medicare contractors via letter, facsimile
transmission or e-mail, or in the form of a subpoena duces tecum or Provider
Reimbursement Review Board discovery request to CMS.

If you are seeking personalized information pertaining to your Medicare benefits and services,
including claim information (excluding Part D claims) you may access this information online
through the following CMS website: www.MyMedicare.gov.

We have initiated a search to locate records falling within the scope of your request. If our
searching units advise us that you have requested a voluminous amount of records that require
extensive search and examination, my staff will contact you shortly to discuss your willingness
to modify your request.

The FOIA requires that we respond to your request within 20 working days of its receipt in this
office. Please note the following unusual and exceptional circumstances that will impact our
response time: (1) we will need to search for and collect records from components and/or field
offices external to this office; and (2) because we receive a very heavy volume of FOIA requests,
we will process your request in line with our established policy of "first in, first out" case
processing. This policy is consistent with court decisions regarding FOIA's time limits. To
check the status of your request please refer to the CMS FOIA website
at http://www.cms.gov/apps/FOIA. The status of your request is displayed after you have entered
the control number and PIN number in the appropriate fields.

The law authorizes us to collect fees for responding to FOIA requests and assume that you are
willing to pay any applicable fees for processing this request. If at any time the fee for

processing your request is estimated to exceed $250.00, we will send you an invoice for the estimated fee and suspend further processing until payment of the invoiced amount is received. If the estimated processing fee does not exceed $250.00, we will send you an invoice for the actual fee with our response.

Please note the following:

If you believe that we should expedite the processing of your request because the requested records are needed in light of a compelling need; i.e., an imminent threat to the life and safety of an individual; an urgency to inform the public concerning government activity (provided you are a member of the media); a deadline in litigation; a deadline for commenting on proposed regulations; or other urgent matters, you must ask for expedited processing in writing and provide to this office as much relevant information as possible. In line with 5 U.S.C. § 552(a)(6)(E)(vi), you must demonstrate the compelling need in a statement certified to be true and correct to the best of your knowledge and belief. Attach any supporting documentation to your statement, including a court scheduling order if your request is based upon a litigation deadline. (Fax supporting documentation to the Freedom of Information Group at (410) 786-0474).

If your request seeks a waiver or reduction of the fees that we would customarily charge for furnishing agency records and your request does not contain sufficient information to enable us to determine whether a waiver or reduction of fees is warranted, you should provide such information to this office within 10 working days of receipt of this letter. In line with 45 C.F.R. § 5.45, such information must include a detailed explanation of how disclosure to you: (1) is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government, and (2) is not primarily in the commercial interest of the requester. I especially need to know how you intend to disseminate the information to the public.

When submitting this additional information, please refer to the case number listed at the top left-hand corner of this letter, and send it to: The Freedom of Information Group, Room N2-20-16, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

Any questions regarding the status of this request should be directed to **Vendetta Dutton** at **410-786-0519**.

Sincerely yours,

Michael S. Marquis
Director
Division of Freedom of Information

# Exhibit G

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850



**CENTERS for MEDICARE & MEDICAID SERVICES**

<u>Office of Strategic Operations and Regulatory Affairs/ Openness, Transparency & Accountability Group</u>
Refer to:  Control Number **030720127082** and PIN **W767**

5/21/2012

**Matt Ehling**
**Public Record Media, LLC**
**2375 University Ave. W, Suite 200**
**Saint Paul, MN 55114**

Dear Mr. Ehling:

I am acknowledging receipt of your 4/23/2012 Freedom of Information Act (FOIA) appeal, which
you sent to the Deputy Administrator, Centers for Medicare & Medicaid Services (CMS).  We will
process your appeal as expeditiously as possible, consistent with Department of Health and Human
Services FOIA rules set forth at 45 CFR Part 5.

Questions regarding your appeal should be directed to Deborah Peters of my staff at 410 786-3677.

Sincerely,

Michael S. Marquis
Director
Division of Freedom of Information

# Exhibit H



JT Haines
Public Record Media, LLC
2375 University Ave West
Suite 120
Saint Paul, MN 55114

November 8, 2012

Deborah Peters
Department of Health and Human Services
Centers for Medicare and Medicaid Services
7500 Security Boulevard, Mail Stop N2-20-16
Baltimore, Maryland 21244-1850

**RE:  FOIA Administrative Appeal Related to Number 030720127082 PIN W767**

Dear Ms. Peters,

My client Public Record Media, LLC submitted a FOIA request to your agency on
February 22, 2012 (attached).

The statutory timeframe for responding to this request elapsed twenty days from the date
of receipt. Your agency's acknowledgment letter of March 8, 2012, appeared to indicate
that "unusual and exceptional circumstances" prohibited your agency from responding
within the statutory timeframe. The FOIA provides agencies an additional ten days to
respond in such circumstances.

As of May 21, 2012, both the twenty-day statutory response time and the ten-day
extension period had elapsed without a response from your agency. On that day, my
client filed an administrative appeal with your agency to facilitate the production of
documents responsive to its request.

As of this date, your agency has not processed my client's administrative appeal. As your
agency has not responded within the prescribed time frame, my client is deemed to have
exhausted its administrative remedies, and may file a lawsuit in federal court to compel
compliance with the FOIA.

The records my client is seeking are highly relevant and important to an ongoing public
policy discussion in the State of Minnesota – a discussion that will be of additional
import during the upcoming Minnesota Legislative session as the records may have
information of value to the Legislature's deliberations on matters concerning Medicaid-

related programs. As the legislature convenes in January of 2013, there is an urgent public need for disclosure of the records my client has requested prior to that time. In order to obtain the records, my client is prepared to enter litigation.

Please respond by **November 23, 2012**, with the requested records, or to propose a timeframe for release. Thank you.

Regards,

/s/ JT Haines
JT Haines, ESQ.
2375 University Avenue West
Suite 120
Saint Paul, MN 55114
jthaines@publicrecordmedia.com
*Attorney for Public Record Media*


Cc: Michael S. Marquis (encl)

Matt Ehling
Public Record Media, LLC
2375 University Ave. W
Ste 200
Saint Paul, MN 55114


February 22, 2012


Centers for Medicaid and Medicare Services
Attn:  Freedom of Information Officer
North Building, Room N2-20-06
7500 Security Boulevard
Baltimore, Maryland 21244


RE:  Freedom of Information Act Request


Dear FOIA officer,

This is a request under the Freedom of Information Act (5 U.S.C. § 552).  I request that copies of the following records be provided to me:

> Any and all memoranda, correspondence, or communications - in paper or electronic form – between employees or officials of CMS, and Minnesota State Senator John Marty;

> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS related to Minnesota State Senator John Marty;

> Any and all memoranda, correspondence, or communications – in paper or electronic form – between employees and/or officials of CMS, produced between January 1, 2011, and February 1, 2012, related to determinations made by your agency about Minnesota's 1115 Medicaid waiver status.

In order to help you determine my status for the purpose of assessing fees, you should know that this request is made as part of news gathering, and is not for commercial use. Responsive files will be shared with researchers, journalists, and the public, and will not be licensed for profit.

I am seeking a waiver of fees for this request, since the public dissemination of the requested materials will aide the public's understanding of the federal government's role as it relates to Minnesota's public health care programs.

If my fee waiver is denied, I am willing to pay fees of up to $100.00 without prior notice. If fees are estimated to exceed this amount, please notify me first.

If this request is denied in whole or in part, please notify me of the legal basis for the denial, as well as all appeals procedures available under law.

I can be contacted at 651-335-2037 or info@publicrecordmedia.com if you need to discuss any aspect of this request.

Sincerely,

Matt Ehling
President, Public Record Media